Good morning, everyone. The first argued case this morning is number 08-1537, B-K Lighting v. Vision Lighting. Mr. Shapiro. Good morning, Your Honors. This is a patent litigation involving a patent. The central improvement to this patent was a tapered opening and a tapered post that would pivot frictionally. By pivot frictionally, this meant that when a locking screw was loosened, a user could adjust and pivot. When the user let go, it was a lighting fixture. The lighting fixture would stay in place. It seems to me that you've got a decent argument with respect to frictional pivoting and not being present in the prior art. But you've raised all sorts of other limitations which you say were not in the prior art. I've looked at those and it strikes me that with respect to those, there was a basis for the district judge on summary judgment to find that those were either present in specific prior art or that they were rather common like reversing the direction of screws or putting in O-rings or something like that. Is there any other limitation where the record failed to support the district judge's determination that these were in the prior art or were common in common usage? I was having trouble with these other limitations that you say were absent from the prior art. The two prime limitations you've mentioned, one is the frictional pivoting and whether in the hydral reference, what I've called in my briefs a release clamp, whether that was a support structure. The court found that that was in fact a support structure because it supported the light fixture. In fact, looking at the hydral reference, it's very clear that it didn't support anything, that there was a support structure. Was there conflicting testimony on that point? No, there wasn't. As a matter of fact, the only testimony again was like half the sentence from the defendant's expert, from FEC's expert that said it's half of a support structure. That was the only evidence about that. So there was something there to support what the district court concluded with respect to that and it was not contradicted by Pratt's testimony, right? No, Pratt did contradict it directly. On that point? Yes, he said that it was not a support structure. So with respect, with the exception of those two, that is this support structure testimony that we just talked about and the frictional pivoting, everything else, there was a basis for the district court to grant summary judgment. Your Honor, there was an element called the first locking means which was present in all of the claims. That was not supported by the evidence. That's the direction of the screw. No, that was the first locking means was the lock screw that would go through the tapered opening. That was not present in the prior art because there was no tapered opening in the prior art. But that seems to be related to the tapered opening question. Yeah, that's correct. I was just going to say I think those three are all related and I think it was very clear that that was missing from the prior art. Another one was the slot limitation. The slot limitation, the only evidence of a slot limitation in the prior art had to do with the 360 SL. But there was testimony by Dornfeld that that was fairly common. I don't recall that testimony, Your Honor. I think that what his testimony was that I don't think, more or less he said, I don't think that there's a slot in the prior art, but if you say that we infringe, we have the same thing that's in the prior art. That's what he said. Yeah. But the court never really decided the infringement issue. And, in fact, there were differences in the summary judgment motion relating to infringement. BK had given very specific dimensions about the slot in the accused's device explaining why it was narrow and why it was a slot. There was none of that evidence regarding the prior art. So, in fact, I believe that there was no evidence that would support the slot finding. In fact, the judge made no finding on that at all and didn't address that. The judges don't make findings on summary judgment. I understand. We can just look at the record, and if we find it's in the record and it's uncontradicted, that's enough. Again, that was the evidence on the slot was this, if we infringe, it's in the prior art. But there were differences between what was described in the infringement motion and what was described as far as the prior art. And I believe that there wasn't sufficient evidence on the slot limitation as well. That was four of the claims. The first, sealing means, I also believe wasn't present. I think that's probably one you're alluding to, that maybe it was common to put a sealer, some kind of coating or something. Yeah, Noreen said it was common to put a sealer on there. So I think those are the primary for the fictional pivoting, the support member, the first locking means in the slots that I believe there wasn't evidence, or certainly not enough evidence to make out a prima facie case of invalidity. I just want to confirm one thing. This sort of picks up a little bit what you were discussing with Judge Dyke. The first resistance means limitation, which is the main focus, I think, of the case, that is pertinent, as I understand it, to all claims except claims 1 and 23 through 31. Is that correct? I think that 1 is actually not in the claim. I think that was a reissued patent. I think that one was withdrawn or canceled, I believe, claim 1. The other claims don't state that, but they also have the other limitation. Oh no, I understand that. I'm just focusing on the resistance means limitation. That's correct. It's not in all the claims. Okay. With regard to the purpose of this patent, as I said, was to allow a user to loosen a screw and to be able to adjust the lighting. It would hold in place. The user could walk away, look and see whether the lighting was what he or she desired, and then come back, make another adjustment, or go ahead and tighten it back up. The prior art did not allow for that. That's a significant difference. In fact, it was a big savings in time. It made it easier to use. One of the witnesses for FEC admitted that the commercial embodiment, and there's no dispute that this was a commercial embodiment of the patent invention, was the most popular product on the market. With respect to all these other claim limitations that you say weren't present in the prior art, those weren't identified as significant in the patent, right? None of them was identified as significant in the patent except for the frictional pivoting. I don't think that they were all. I mean, it didn't specifically say that this was the significant one either. It was one of the features. But the other features aren't mentioned as being differences from the prior art in the patent. I think that they are. They are? Where? Well, I mean, they're not specifically stated that, oh, this is different than the prior art. I think what the patent specification said was the difference is that you've got all these products where you typically need two people, one to be doing the adjusting, the other to be… That's related to the frictional pivoting. Where in the patent is any of these other differences that you've identified stated to differentiate the invention of the patent from the prior art? It's not just the frictional pivoting. It's also putting the tapered opening in the support structure. It's all part of the same mechanism that has the locking screw that goes through the tapered opening, the tapered opening and the support structure. All of this is what creates the frictional pivoting. So the slot is described and discussed explicitly because what it allows is for you to be able to turn it substantially without getting all the wires tangled up. And so that's what they did for that purpose. So I think all of that is discussed in the specification. I think where it says it's different than the prior art is where it is the actual improvement, the general improvement, the ability to be able to adjust it. It stays in place. Take a look. If it fits, it's good. Tighten the screw. If not, you can adjust it some more. I think that's what overall it said. But I think all of these different limitations are part of that mechanism. So in the prior art, if you wanted to make an adjustment, what would you have to do? Remove the entire structure and start again? No, Your Honor. You could, one, adjust where you wanted, tighten it, and then stand up. And then you'd have to come back and undo it and all this kind of thing. Or you would have one person hold it and do the adjusting while another person stood away and looked to see if the light was what you wanted. So this basically made it just simpler. Simpler and easier. So that the person could just put it where he or she wanted it, just let it go, stand back, look, come back, adjust, without having to unscrew. Most of the prior art that's cited in this case, like the Kelly and other items that were in this case, have actual serrations or mating. So you'd have to actually put it back and tighten it to where it had to be and go back and look. So this was an advantage, an improvement on the art. Shall we hear from the other side and see if that will come? Thank you, Your Honor. Mr. Mathiewicz. May it please the Court, Wayne Mathiewicz on behalf of Appellee Fresno Delves and Castings, doing business with Vision 3 Lighting. The legal issue here is whether it would have been obvious to an ordinary mechanical engineer in the 1998 timeframe to take the prior art 360 SL product, the BK's own product, and to scale it up by using tapers to come up with the claimed invention. Well, the 360 SL doesn't show the frictional pivoting, right? That is correct. Okay, and what the district judge said was, I find it in hydro. And the problem is, it seems to me that you have, is that there's conflicting testimony between Dornfeld and Pratt as to whether this was present in hydro. And looking at hydro on the face of it, it doesn't seem to me obvious that it relies on frictional pivoting. It may be that there are other references that could lead one to that conclusion, to find it in other prior art. But it seems to me you've got a very hard time to sustain what the district judge determined here, that is that it was present in hydro. That's a matter of law on summary judgment. The district court pointed to two things. It pointed to the knowledge of one of ordinary skill in the art, would know that tapers can be used for this purpose. Tapers have been around for a long time. It's very common in the machine tool industry. And Dr. Dornfeld stated in his declaration that tapers were commonly used. That's a different point, though. What I was asking about is the determination that it was present in hydro. It seems to me that there was a conflict in the affidavits and it's not clear from the face of hydro that it was present in hydro. That's a problem. As I say, you may be able to convince us that it's present in other prior art or that it was common generally. But insofar as the district court found that there was no material genuine issue with respect to hydro, it seems to me that's hard to sustain. What the court did was the court looked at hydro and based on the testimony, first Dr. Dornfeld testified that hydro did have frictional pivoting, that it had this. Sure. And Pratt said it didn't. And Pratt said it did, but the court basically said Mr. Pratt's testimony cannot be relied on here because it contradicts. The only reason that Mr. Pratt gave was that he said in the hydro reference, it refers to a self-releasing taper. And he said without really any discussion whatsoever, self-releasing to me sounds like it doesn't provide any frictional pivoting. Both of the affidavits were somewhat conclusory, but it's hard, it seems to me, to claim that one is more specific than the other. Actually, the court dealt with that two or three pages in its brief. It dealt with that specific issue because it was raised at the hearing. The court said Dr. Dornfeld makes it clear that one of ordinary skill in the art would know to use tapers for frictional pivoting and also that hydro has this. That created, in the court's opinion, created a prima facie case of obviousness. But that made it necessary for BK to come back and to offer some evidence that, in fact, there was no frictional pivoting. And all that Mr. Pratt said was, I disagree that there's frictional pivoting here. And so now the court says, well, on its face, it looks like this is just a battle of the experts. But in fact, you have to go behind what Mr. Pratt has said. Suppose we reject that. Suppose we say we can't be sure that it was present in hydro. We think the district court made a mistake in finding that it was present in hydro as a matter of law. What other evidence do you have that it was present in the art general? What what uncontradicted evidence do you have that it was present elsewhere? The uncontradicted evidence would be from for Mr. Dornfeld from Dr. Dornfeld that tapers are commonly used. Where does he say this? Dr. Dornfeld says that at his declaration at paragraphs 13 and 79. 1379? 13 and 79. What page in the appendix? Because that's what we have. Yes. It is at page 1392. And at 1411. So Dornfeld talked about... Wait, wait, wait. So where on 1392 does he say that? At the top of the page, the bottom of 1392 and the top of 1393, is that what you're talking about? Yes. Yes. And it was uncontradicted that tapers are commonly used in the prior art to provide frictional pivoting. And then 1411? Yes. In paragraph 79 of Dornfeld's declaration. Now, Mr. Pratt also admitted that tapers are well known. Page... What page is that in Dornfeld's site? Paragraph 79. At 1411. The beginning on line 11? Yes. First one. And where does he in these references talk about frictional pivoting? I mean, certainly tapers are... Everyone knows tapers are common. He talks about there where he talks about... Tapers have been used for years, widely used for holding machine tools such as spindles for axles or any other application requiring a self-centering, self-locking shaft. That is what he is referring to there. That was... You need to make the transition. We know that for a device, a mechanical device, it would be very unusual indeed if a particular component didn't exist somewheres in the prior art. So you have to get from these uses in terms of obviousness to the patented use, which is not holding a machine tool. It's not a spindle for an axle, as in this affidavit. But the principle behind the taper is exactly that. It's having two surfaces fitting together that provide friction. They are tapered surfaces. And that's what Dr. Dornfeld was referring to. And actually, Dr. Pratt, as set forth in the court's order at page 33, admitted that tapers were known in the industry as well. So there really isn't... Where does Pratt say that? Well, I was referring to paragraph 33 of the court's order. Dr. Pratt, in his declaration at 16, tries to... On what page of the appendix? I'm sorry, 2847. And where does he say this about the tapers? What... You put it all in context. No, but what line? What testimony are you relying on here? Okay. He starts at line 12, saying that there's no teaching as to how the tapered arrangement could be modified to do away with... Yeah, but where's the concession about tapers being common? I don't have it right in front of me right now, Your Honor. Paragraph 4 of the Pratt deposition at 2841. He says, the general idea of tapered surfaces is known. But then he goes on to declare that none of the prior references disclose to each other how those surfaces might be used to provide this positive lock. Yeah, but that's not... I think that wasn't disputed, but in terms of getting from the general idea of tapered surfaces to this particular device and this use, this is where, on summary judgment, where we're seeking your position. The court noted that what you have in the patent, there is a discussion that this is a tapered... they use tapered surfaces. The person who actually designed this, Mr. Case, testified that they used a self-releasing taper. Now, that was evidence that the court looked at and said, self-releasing... It's clear that the person who designed this knows they used a self-releasing taper, and they used that to provide the frictional interplay in the parts. You're putting the inventor's testimony as prior art? No, I'm just explaining how you get to hydrel as providing the link. And that is, the patent says... The patent itself says... It doesn't talk about a self-releasing taper or a self-locking taper. It just says that there is a tapered surface. Hydrel clearly discloses a self-releasing taper. It says it relies on machine tool technology to provide a positive lock. The person who designed the BK fixture... I don't know why that necessarily tells you about frictional pivoting. I mean, the terminology is not the same. It's not clear that it's the same thing. Well, there the court relied on the fact that what the patent talks about is using tapers. Tapers provide frictional pivoting. They can or they can't. I mean, there are lots of situations where you use tapers that you're not relying on frictional pivoting. There we have Dr. Thornfeld testifying that it's a common use of tapers. Mr. Case is saying, we used a taper. We used a self-releasing taper in order to provide frictional pivoting. So Mr. Case is saying, we have a self-releasing taper in our device. Now, the court looks to the Hydrel reference, and the Hydrel reference says, we use a self-releasing taper. The court found that that created prima facie... So what's a self-releasing? What is self-releasing? How do we know what self-releasing means? Self-releasing was not defined anyplace. Mr. Case indicated... That's the problem. They used a self-releasing taper, but that taper locks. Self-releasing is not defined anywhere. How are we supposed to know what it means? Dr. Thornfeld testified that one of ordinary skill in the art would understand that you can use these tapers for this to provide the frictional pivoting. So the court was really looking at it from the standpoint of... Hydrel says it's a self-releasing taper. Mr. Case said, we have a self-releasing taper. We don't know what a self-releasing taper is. You say there's no place it's defined. What am I supposed to make out of this? But in the patent, it says that this taper is used to provide frictional pivoting. Mr. Case said, we have a self-releasing taper. The court drew the obvious inference from the art that there is a self-releasing taper in the patent. And then Hydrel has a self-releasing taper, and it says specifically in the Hydrel reference that the self-releasing taper is... But you're not addressing the problem, that we don't know what a self-releasing taper is. It's not defined. The court got to that definition by looking at what the patent says and understanding from Mr. Case that what the patent says is you have frictional pivoting. And Mr. Case, who designed it, said this is a self-releasing taper. So the court says, okay, the patent has frictional pivoting. Mr. Case says, we have a self-releasing taper. Hydrel says we have a self-releasing taper. However, the court reasonably concluded, and it was not refuted with any specific evidence from Dr. Pratt, that there was a self-releasing taper in the patent. And therefore, what the patent disclosed is the same as what Hydrel disclosed. Okay. Thank you. We've exhausted your time. Thank you. Is there any consideration? Mr. Shapiro. Thank you, Your Honor. I'm going to be brief, but on the issue of a self-releasing taper, that was just a matter of semantics. There was one man that mentioned the word self-releasing taper, and the word was mentioned in the Hydrel reference. But there's nothing in the Hydrel reference that's the same about the patent. For instance, it's not just the taper. It has to be a support member. It has to be supporting a heavy light fixture on top of it. That's all in the claims. None of that, just saying, oh, there's a self-releasing taper, therefore it's the same device. Do you agree that a self-releasing taper is referring to frictional pivoting? No. Because you have to, it's the whole design. It's having the tapered opening and the support structure. That's not quite responsive to my question. My question is, when Hydrel refers to self-releasing tapers, is it referring to frictional pivoting? No, there is no frictional pivoting in Hydrel at all, I believe. What do you understand self-releasing to mean? I'm not certain what it means, and there's nothing in the record. I did not represent the EK and the trial court. I just have the record just like you, and that was never defined one way or another. I believe it has to do with the angle of the taper is my understanding. But, again, there was nothing in the record about it. Mr. Schroer, what role does the spring play in Hydrel? The spring pushes the, what I call the release clamp, away from the post. Does that have anything to do with the releasing that takes place in Hydrel? It pushes it away. Self-releasing is just talking about the taper itself. I'm saying that's a distinction between Hydrel and the claimed product because there's no spring, there's no coiled spring in the claimed product. Right, because the whole point is for the surfaces to be in contact and to be creating friction, where in Hydrel there's a spring pushing the surfaces apart. So that's, again, another reason that there would not be frictional pivoting in Hydrel. Maybe. You could have a spring to make sure that they didn't meet with such force that you couldn't pivot it. It could be designed to keep it so that it touched lightly in frictional pivoting. You could pivot and it would still move. Frictional pivoting, the way the court, and I guess the FEC has said what it means, which is basically it has to be enough that you have this heavy fixture that you... I understand, but having a spring in there is not necessarily inconsistent with frictional pivoting. I believe it's inconsistent, but it's hard to know because nobody talked about the release spring or the spring in the device. Certainly, Dornfeld did not talk about it, and I don't believe Pratt specifically mentioned it at all. I think it's within one of the sentences of his opinion, but he doesn't specifically mention the spring. Let me just go briefly over a few points. This concept of frictional pivoting is not in one of the items of prior art that was submitted in the summary judgment motion, not in Hydrel and not in any of them. The whole thing, KSR, and they've mentioned KSR, talks about common sense. Common sense says that this is not found anywhere, apparently, in any item of prior art that they could find. There's nowhere where you have purposefully causing friction between two surfaces in a taper. This would be a fairly common concept, don't you think? I believe that the tapers are out there, but the idea of actually designing it so that there's metal-on-metal friction is against pretty much all of mechanical design. I mean, typically friction is something to be avoided. When you have it in a car engine, you have oil, you have lubricants. This was somebody who said, you know what, let's go against the grain and take two surfaces so that they rub against each other and cause the thing to stop. I haven't seen that in a machine or prior art, and they couldn't find anything in the art. There's two other points, too. They copied the device, and I believe we had a prima facie case of copying. There's no real evidence that they copied it. All you have is evidence that they knew about it. They knew about it, and they made an infringing product, which I believe— That's not enough to show copying, is it? I believe it is. I did cite one case. It was a recent district court case that said that's a prima facie case. I've also done a lot of copyright litigation, and that's enough to make a copyright case. All you have to show is similarity and access. That's exactly what they had here. So I believe there was a prima facie case of that, and we were in summary judgment. I mean benefit of the doubt is supposed to be given to BK, not FEC. We also had the commercial success. I want to briefly mention because Your Honor mentioned other items of prior art. I think the court correctly did not rely on these other items. Kelly did not have frictional pivoting. It had serrations. It didn't have a first locking means. For instance, the bolt, when it didn't go in through a tapered opening, the bolt went through a post. Item 61. And as Pratt testified, he said that Kelly taught away from frictional pivoting, and that's in our brief. And also he testified on paragraph 10 of his declaration at 2844 that the ribs are what perform the locking, not the screw or the bolt. The other item was heldrick that was mentioned in their brief. The court decided there was an issue as to whether it was analogous art. But Pratt specifically testified there's no frictional pivoting in that and did a four-paragraph description of why there was no frictional pivoting in that device and why it wasn't about frictional pivoting. It was about locking. And that's it, paragraph 15, 2846 of the appendix. We need to wrap it up, Mr. Shapiro. One last sentence, if you wish. Yeah, just again, the other thing they mentioned was Coronado, which on the face of it in their brief, they say had serrations again, has no tapered opening post. I think the crux of it is, is, Your Honors, that there's no prior art that teaches the frictional pivoting, tapered opening combination. And there was no evidence that it was obvious to make that change. And to, I believe that the summary judgment should be reversed. Thank you, Your Honors. Thank you. Thank you both, Mr. Shapiro and Mr. Defani. This case is taken under submission.